3 P.3d 936

**U S WEST COMMUNICATIONS, INC.,
a Colorado corporation, Plaintiff–
Appellant,**

v.

**ARIZONA CORPORATION COMMIS-
SION, an agency of the State of Arizona;
Renz D. Jennings, Marcia Weeks and
Carl J. Kunasek, as members of the Ari-
zona Corporation Commission, Defen-
dants–Appellees,**

Sprint Communications, Inc.; AT&T Com-
munications of the Mountain States,
Inc.; MCI Telecommunications, Inc.;
TCG Phoenix; Arizona Payphone Asso-
ciation, Intervenors–Appellees.

No. 1 CA–CV 97–0517.

Court of Appeals of Arizona,
Division 1, Department B.

May 18, 1999.

Review Denied April 18, 2000.*

* Justice Feldman recused himself and did not par-   ticipate in the determination of this matter.

**18**

U S West Law Department by Norton Cutler, William M. Ojile, Jr., Denver, Colorado, and Wilmer, Cutler & Pickering by Louis R. Cohen, Jonathan R. Frankel, Washington, D.C., and Fennemore Craig, P.C. by Timothy Berg, Theresa Dwyer, Phoenix, for Plaintiff–Appellant.

Arizona Corporation Commission by Janet F. Wagner, Janice M. Alward, Phoenix, for Defendants–Appellees.

Osborn Maledon, P.A. by Andrew D. Hurwitz, Joan S. Burke, Phoenix, for Intervenors–Appellees TCG Phoenix, AT&T Communications of the Mountain States, Inc.

AT&T Communications of the Mountain States, Inc. by Maria Arias–Chapleau, Mary Tribby, Denver, Colorado, for Intervenor–Appellee AT&T Communications of the Mountain States, Inc.

Lewis and Roca LLP by Patricia K. Norris, Thomas H. Campbell, W. Todd Coleman, Phoenix, for Intervenor–Appellee MCI Telecommunications, Inc.

Ridge & Issacson, P.C. by Steven J. Duffy, Phoenix, for Intervenor–Appellee Sprint Communications, Inc.

## OPINION

RYAN, Judge.

¶ 1 For more than eighty years, U S WEST Communications, Inc. ("U S WEST") and its predecessor have had a monopoly in providing local telephone service in Arizona. Recently, the process to change this situation in the local telecommunications field was begun. This appeal presents questions arising out of these first steps to introduce competition in the local telecommunications field.

¶ 2 U S WEST challenges the Arizona Corporation Commission's ("Commission") rules setting the structure to allow other telecommunications companies to compete for customers. U S WEST argues that the promulgation of those rules constituted a breach of contract. It also asserts that the rules were improperly adopted because the Commission failed to obtain approval of the attorney general. The trial court agreed with the Commission on both issues. We hold that the rules do not establish a breach of contract. We also hold that some of the rules were not properly adopted under the Arizona Administrative Procedure Act. Thus, we affirm in part, reverse in part, and remand with directions.

### I.

¶ 3 U S WEST and its predecessor have provided telephone service in Arizona since statehood. In 1912, the Commission created a monopoly for providing telephone service in favor of U S West's predecessor. The companies subsequently invested billions of dollars in establishing and maintaining the infrastructure necessary to provide that service, including local and intraLATA long distance service.[1] The monopoly appears to be

---

1. "LATA" stands for "Local Access and Transport Area." LATAs were established as a result of the AT&T divestiture. *See United States v. West-* *ern Elec. Co., Inc.,* 569 F.Supp. 990 (D.D.C. 1983); *United States v. Western Elec. Co., Inc.,* 569 F.Supp. 1057 (D.D.C.), *aff'd sub nom. Cali-*

nearing its end, however, with the advent of competition in the field.

¶ 4 On June 23, 1995, the Commission issued Decision No. 59124, in which it adopted the Competitive Telecommunications Rules ("competitive rules"), Arizona Administrative Code R14–2–1101 to –1115. (The rules are attached as an appendix to this opinion.) In general, the competitive rules allow telecommunications providers to apply for certificates of convenience and necessity ("CC&Ns") to enter into competition with U S WEST in providing local and intraLATA long distance service.[2] Several companies Sprint Communications, Inc. ("Sprint"); AT&T Communications of the Mountain States, Inc. ("AT&T"); MCI Telecommunications, Inc. ("MCI"); TCG Phoenix; and Arizona Payphone Association applied for and were granted CC&Ns to compete with U S WEST in various areas.

¶ 5 U S WEST intervened in the CC&N application proceedings filed by AT&T, MCI, and Sprint. In none of the cases did U S West either introduce evidence or file information that would meet the filing requirements for rate cases, universal service fund cases, or competitive services classifications.

¶ 6 Later, U S West sued the Commission alleging, among other things, that the Commission breached U S West's contract with the State and that the enactment of the competitive rules violated the Arizona Administrative Procedure Act. MCI, TCG Phoenix, and Arizona Payphone Association intervened in the suit. U S West also filed separate lawsuits against AT&T and the Commission, MCI and the Commission, and Sprint and the Commission. These lawsuits challenged the Commission's grant of com-

petitive CC&Ns to AT&T, MCI, and Sprint. These latter cases were consolidated with U S West's original action against the Commission.

¶ 7 U S WEST filed a motion for summary judgment arguing in part that the Commission's rules breached its "contract" with the State and that the competitive rules were invalid because they were not approved by the attorney general, as required by the Arizona Administrative Procedure Act, before filing with the Secretary of State. The Commission filed a response and cross-motion for summary judgment. TCG Phoenix joined in the Commission's response and cross-motion. AT&T filed a separate response and a motion to dismiss. MCI filed a motion to dismiss and also joined in AT&T's motion to dismiss and in the Commission's and AT&T's response.

¶ 8 The superior court denied U S WEST's motion for partial summary judgment and granted the Commission's cross-motion for summary judgment and the motions to dismiss filed by AT&T and MCI. U S WEST appeals. U S WEST does not appeal from the dismissal of its claims against AT&T and MCI.

## II.

### A.

¶ 9 Before we reach U S West's substantive claims, we must address the Commission's argument that U S WEST's complaints are not ripe for review because U S WEST has not requested rate relief. If a party has not exhausted its administrative remedies, the controversy is not ripe for review and the court will not intervene in the

---

*fornia v. United States,* 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983) (mem.). Under the divestiture decree, all Bell telephone territory was divided into LATAs, generally centering upon a city or other identifiable community of interest. *See Western Elec. Co.,* 569 F.Supp. at 993–94. Arizona has two LATAs, the Phoenix LATA and the Tucson LATA. *See id.* at 1050. Telephone "calls placed within any one LATA may still be either 'local' or 'toll' depending upon the requirements or rates established by state regulators." *Id.* at 995. U S WEST has been permitted to provide intraLATA long distance service, but not interLATA service. For further

discussion of the differences between interLATA and intraLATA services, see *U.S. West Communications, Inc. v. Arizona Department of Revenue,* 193 Ariz. 319, 972 P.2d 652 (App.1998).

**2.** In February of 1996, Congress enacted the Telecommunications Act of 1996, mandating competition in the telecommunications industry. Pub.L. No. 104–104, 110 Stat. 56 (1997). Under the Act, states are prohibited from creating or maintaining barriers to entry in the telecommunications market. *See* 47 U.S.C. § 253(a) (West Supp.1998).

dispute. *See Arizona Downs v. Turf Paradise, Inc.,* 140 Ariz. 438, 445, 682 P.2d 443, 450 (App.1984). Here, we believe that whether this matter is ripe for review is predominately a legal question. *Cf. Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (holding that an agency's determination of whether a statute was properly construed was a purely legal issue, and therefore ripe for review), *abrogated on other grounds by Califano v. Mister Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). We review legal issues *de novo. See Libra Group, Inc. v. State,* 167 Ariz. 176, 179, 805 P.2d 409, 412 (App.1991).

¶ 10 Part of U S WEST's breach of contract argument is that the Commission's action allows competitors to capture its most lucrative customers, which will result in substantial loss to the corporation. The Commission responds that there are mechanisms in place, both within the competitive rules and in U S WEST's ability to request rate relief, that will avoid any unfair reduction in U S WEST's income. The Commission contends that if U S WEST would request such relief, the Commission could respond with appropriate measures to ensure that U S WEST receives a fair rate of return. Because U S WEST has not requested such rate relief, the Commission argues that U S WEST has not exhausted its administrative remedies and this dispute is not ripe for judicial review. We disagree.

¶ 11 U S WEST asserts that its relationship with the State is contractual and focuses on two principal terms of this purported contract. First, the State promised U S WEST a monopoly. Second, in exchange for U S WEST's promise to serve all Arizona customers, both profitable and unprofitable, the Commission would set rates that, in the aggregate, would allow U S West to make a profit.

¶ 12 The monopoly requires U S West to serve customers for whom the cost of service is so high that the Commission has elected not to allow U S WEST to recover the entire cost of service from those customers. Instead, the cost of these customers' service is subsidized by other customers, for whom the Commission has set higher rates. It is the lower-cost, higher-rate customers for whom the competitors will naturally compete. As U S WEST loses some of these customers, its mix of customers will swing from the profitable to the non-profitable, reducing its per-customer income at the same time its per-customer costs increase. It will thus not be able to recover a fair rate of return on its property devoted to public service.

¶ 13 U S WEST argues that the Commission's action allowing other telecommunications companies to compete for its more lucrative customers breaches a material term of the contract. It points to the negative effects of competition on its profits to demonstrate that the promise of a monopoly is a material term. It argues that one party's breach of a material term excuses the other party from its obligation to perform under the contract. *See Zancanaro v. Cross,* 85 Ariz. 394, 400, 339 P.2d 746, 750 (1959).

¶ 14 The Commission argues that U S WEST can file a rate case to adjust the rates it can charge its remaining customers. An adjustment would allow U S West to rebalance the mix to allow a fair rate of return. This adjustment would permit it to compete with the new competitors in the competitive markets and thereby increase profits. Until U S WEST requests such rate relief, the Commission contends, this dispute is not ripe for review because U S WEST has not exhausted its administrative remedies.

¶ 15 U S WEST's argument, however, requires us to make the legal determination of whether a contract exists between U S WEST and the State and whether the State breached a material term of that contract when the Commission eliminated the protection against competition afforded U S West in its service territory. It does not matter whether U S WEST will be able to adjust rates to achieve a fair rate of return. If the promise of exclusivity is a material term of the supposed contract, and the State has breached that contract, then U S WEST may be excused from performing its obligations under the contract. Thus, U S West would not have to incur expenses nor consume time obtaining rate relief. We therefore hold that U S WEST's claim for breach of contract is ripe for judicial review.

## B.

¶ 16 We also hold that U S WEST's argument that the Commission improperly bypassed the attorney general approval process is ripe for judicial review. Over U S WEST's objections, the Commission promulgated the competitive rules. U S WEST then filed a request for rehearing, which was denied by operation of law when it was not granted within twenty days of the issuance of the rules. *See* A.R.S. § 40–253(A). U S WEST then filed this action, challenging the enactment of the competitive rules. The procedures it followed comply with the statute providing for judicial review:

> [A]ny party in interest, or the attorney general on behalf of the state, being dissatisfied with an order or decision of the commission, may within thirty days after a rehearing is denied or granted, and not afterwards, commence an action in the superior court ... to vacate, set aside, affirm in part, reverse in part or remand with instructions to the commission such order or decision on the ground that the ... rule ... is unlawful, or that any rule ... provided in the order is unreasonable.

A.R.S. § 40–254(A). U S WEST has sufficiently exhausted all of the available administrative remedies in its challenge to the adoption of the competitive rules.

## III.

¶ 17 U S WEST asserts that it provides telephone service within Arizona as the result of a regulatory contract with the State. It argues that the Commission could not simply command it to provide the service at specified rates; instead, U S WEST agreed to do so in exchange for the State's promise of protection from competition. U S WEST cites the following for the proposition that it has a contract with the State for providing telephone services:

> By the issuance of a certificate of convenience and necessity to a public service corporation the State in effect contracts that if the certificate holder will make ade-

quate investment and render competent and adequate service, he may have the privilege of a monopoly as against any other private utility. Trico's right to maintain its distribution lines in the area of its certificate, and to make extensions therefrom to customers resulting from the development of the area served by it, is a vested property right, protected by Article 2, Section 17, of the Arizona Constitution.

*Application of Trico Elec. Coop., Inc.,* 92 Ariz. 373, 380–81, 377 P.2d 309, 315 (1962).[3] U S WEST also cites to *Northern Pacific Railway Co. v. North Dakota,* 236 U.S. 585, 595, 35 S.Ct. 429, 59 L.Ed. 735 (1915):

> Broad as is the power of regulation, the State does not enjoy the freedom of an owner. The fact that the [utility's] property is devoted to a public use on certain terms does not justify the requirement that it shall be devoted to other public purposes, or to the same use on other terms, or the imposition of restrictions that are not reasonably concerned with the proper conduct of the business according to the undertaking which the [utility] has expressly or impliedly assumed.

*See also James P. Paul Water Co. v. Arizona Corp. Comm'n,* 137 Ariz. 426, 429, 671 P.2d 404, 407 (1983) (stating that the public service corporation receives a monopoly in return); *Arizona Corp. Comm'n v. Southern Pac. Co.,* 87 Ariz. 310, 350 P.2d 765 (1960) (commenting that the public service corporation gives up the right to set its own rates and to abandon unprofitable lines); *Simms v. Round Valley Light & Power Co.,* 80 Ariz. 145, 149, 294 P.2d 378, 380 (1956) (stating that the public service corporation receives in exchange the right to a fair overall return on its property devoted to public service); *Scates v. Arizona Corp. Comm'n,* 118 Ariz. 531, 533–34, 578 P.2d 612, 614–15 (App.1978) (same).

¶ 18 U S WEST's argument is flawed. The nature of U S WEST's relationship with the State through the Commission is not contractual. The cases upon which U S West

---

**3.** U S WEST also asserts that the Commission conceded in the trial court that the relationship is a "compact," which it argues is synonymous with a contract. *See Farish v. Cieneguita Copper* *Co.,* 12 Ariz. 235, 239, 100 P. 781, 782 (1909); *Jaramillo v. Champagne Pools of Ariz., Inc.,* 125 Ariz. 398, 400, 609 P.2d 1098, 1100 (App.1980). As discussed below in ¶¶ 18–24, we disagree.

relies were speaking descriptively or metaphorically; none holds that there is an actual contract, for breach of which the law of contracts gives a remedy. U S WEST has cited no authority that holds that there is an actual contract or that contract remedies are available under these circumstances.

¶ 19 Courts are reluctant to find that statutes create private contractual rights. "[A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465–66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) (quoting *Dodge v. Board of Educ.*, 302 U.S. 74, 79, 58 S.Ct. 98, 82 L.Ed. 57 (1937)). The Commission granted U S WEST its monopoly acting under the constitution and laws of this State. Nowhere do these laws indicate any legislative intent to create a regulatory contract with U S WEST.

¶ 20 An enforceable contract is formed through an offer, an acceptance, consideration, and sufficient specification of terms. *See K–Line Builders, Inc., v. First Fed. Sav. & Loan Ass'n*, 139 Ariz. 209, 212, 677 P.2d 1317, 1320 (App.1983). The party asserting the existence of a contract bears the burden of proof. *See Graham v. Asbury*, 112 Ariz. 184, 185, 540 P.2d 656, 657 (1975); *Berthot v. Security Pac. Bank of Ariz.*, 170 Ariz. 318, 324, 823 P.2d 1326, 1332 (App. 1991). U S WEST has not carried its burden.

¶ 21 Several of the characteristics of an actual contract are missing here. First, there is no bargained-for exchange. When the Commission granted U S WEST's predecessor the exclusive right to provide telecommunications services, it did so under the prevailing theory of a regulated monopoly. When the Commission, under the 1912 Public Service Corporation Act, *see* Laws 1912, Ch. 90, ordered consolidation of telephone service in 1912, it neither considered nor rejected a proposal not to grant exclusivity if the provider accepted competition.

¶ 22 Second, there is no term to the supposed contract. If there were true freedom of contract here, the contract would be limited in time and the Commission would be free to seek other providers at the end of the term. However, Arizona law does not allow the Commission this freedom. Once granted a CC&N, a public service corporation cannot be divested of it unless it fails to continue to meet the qualifications. *See James P. Paul Water Co.*, 137 Ariz. at 429, 671 P.2d at 407.

¶ 23 Simply because in dicta the regulated monopoly arrangement has been likened to a contract does not mean a contract was created. In fact, many of the government's relationships with individuals and companies can be likened to contracts. For example, it could be said that in exchange for a license to practice medicine, a physician agrees to maintain the necessary skills and qualifications, and to practice in a proficient and careful manner. If the physician "breaches" this agreement, the State takes away the license, but this is done under administrative law, not under contract law.

¶ 24 We therefore conclude that U S WEST has failed to state a claim for breach of contract. The superior court did not err in granting summary judgment on this point.

### IV.

¶ 25 U S WEST also claims that the Commission improperly bypassed the attorney general in adopting the competitive rules. A challenge to the validity of a rule is a question of law, subject to *de novo* review. *See Dioguardi v. Superior Court*, 184 Ariz. 414, 417, 909 P.2d 481, 484 (App.1995).

¶ 26 The legislature has enacted two methods under the Arizona Administrative Procedure Act to review rules enacted by state agencies. Certain agencies are subject to oversight by the Governor's Regulatory Review Council. *See* A.R.S. §§ 41–1051 to – 1057 (Supp.1998). The Commission's rules are not subject to council oversight, however. *See* A.R.S. § 41–1057(2). They are therefore subject to review by the attorney general to ensure that they are clear, concise, understandable, in proper form, and within the

agency's power to make. *See* A.R.S. § 41–1044(A). The attorney general's review is set forth in A.R.S. section 41–1044:

A. The attorney general shall review rules that are exempt pursuant to § 41–1057.

B. Rules that are exempt pursuant to § 41–1057 shall not be filed with the secretary of state unless the attorney general approves the rule as:

1. To form.

2. Clear, concise and understandable.

3. Within the power of the agency to make and within the enacted legislative standards.

4. Made in compliance with the appropriate procedures.

C. Within sixty days of receipt of the rule the attorney general shall endorse the attorney general's approval on the rule package. After approval, the attorney general shall file the rule package with the secretary of state.

D. If the attorney general determines that the rule does not comply with subsection B of this section, the attorney general shall endorse the attorney general's disapproval of the rule on the rule package, state the reasons for the disapproval and within sixty days after receipt of the rule return the rule package to the agency that made the rule.

Rules are invalid if not adopted and approved in accordance with the procedure outlined above. *See* A.R.S. § 41–1030(A).

¶ 27 The Commission bypassed attorney general review and filed the competitive rules directly with the secretary of state. The Commission determined that the competitive rules were not subject to review by the executive branch because they emanated from its ratemaking powers. This determination was based on the Commission's reading of *State ex rel. Corbin v. Arizona Corporation Commission*, 174 Ariz. 216, 848 P.2d 301 (App.1992).[4]

¶ 28 The Commission's powers and duties are set forth in the Arizona Constitution as follows:

The Corporation Commission shall have full power to, and shall, prescribe just and reasonable classifications to be used and just and reasonable rates and charges to be made and collected, by public service corporations within the State for service rendered therein, and make reasonable rules, regulations, and orders, by which such corporations shall be governed in the transaction of business within the State, and may prescribe the forms of contracts and the systems of keeping accounts to be used by such corporations in transacting such business, and make and enforce reasonable rules, regulations, and orders for the convenience, comfort, and safety, and the preservation of the health, of the employees and patrons of such corporations....

Ariz. Const. art. 15, § 3. The Commission's powers are limited to those declared in the constitution and implementing statutes. *See Tonto Creek Estates Homeowners Ass'n v. Arizona Corp. Comm'n*, 177 Ariz. 49, 55, 864 P.2d 1081, 1087 (App.1993). The supreme court has " 'repeatedly held that the power to make reasonable rules and regulations and orders by which a corporation shall be governed refers to the power to prescribe just and reasonable classifications and just and reasonable rates and charges.' " *Id.* at 56, 864 P.2d at 1088 (quoting *Williams v. Pipe Trades Indus. Program of Ariz.*, 100 Ariz. 14, 17, 409 P.2d 720, 722 (1966)).

¶ 29 The Arizona Constitution grants the legislature certain power over the Commission under the following provision:

The law-making power may enlarge the powers and extend the duties of the Corporation Commission, and may prescribe rules and regulations to govern proceedings instituted by and before it; but, until such rules and regulations are provided by law, the Commission may make rules and regulations to govern such proceedings.

---

4. *Corbin* dealt with A.R.S. section 41–1041, which has been repealed. Laws 1994, Ch. 363, § 21. Its substance is now contained in section 41–1044, which was enacted simultaneously with the repeal of section 41–1041. Laws 1994, Ch. 363, § 22.

Ariz. Const. art. 15, § 6. *Corbin* held that this provision does not grant the legislature the right to confer on the executive branch the power to review and reject the Commission's rules and regulations reasonably related to its ratemaking function. 174 Ariz. at 219, 848 P.2d at 304. The Commission relies upon *Corbin* in arguing that the competitive rules are not subject to attorney general review because they implicate the Commission's ratemaking function.[5]

¶ 30 The Commission argues that all the competitive rules are related to ratemaking. We disagree. Some rules clearly are related to the ratemaking power. *See* Rules R14–2–1109 ("Pricing of Competitive Telecommunications Services"), R14–2–1110 ("Competitive Telecommunications Services Procedures for Rate Change"), and R14–2–1113 ("Establishment of Universal Service Fund"). Rule R14–2–1108 ("Determination of a Competitive Telecommunications Service") is also clearly within the Commission's plenary power to establish classifications.

¶ 31 Other rules arguably implicate ratemaking. Rule R14–2–1115 (D)–(F), providing for Commission oversight of accounting records, implicates ratemaking as review of accounting records would allow the Commission to determine whether the company has complied with ratemaking orders. Rule R14–2–1107 requires companies to seek Commission approval to discontinue or abandon competitive services. Abandoning or discontinuing some competitive services can affect a company's profit and loss, and thereby affect its charges for other services. *Cf. Arizona Corp. Comm'n v. State ex rel. Woods,* 171 Ariz. 286, 295, 830 P.2d 807, 816 (1992) (stating that the Commission had regulatory power permitting it to require information regarding, and power of approval over, utilities' transactions with affiliates because such transactions could damage the utilities' assets leading to a request for higher rates).

¶ 32 But we conclude that some rules are not reasonably related to classification or ratemaking. Rules R14–2–1103 through –1106 deal with CC&Ns. Rule R14–2–1103 requires telecommunications companies to obtain a CC&N to engage in competitive services; Rule R14–2–1104 provides for expanding the CC&N for a telecommunications company with existing tariffs;[6] Rule R14–2–1105 provides for granting an initial CC&N for a company that is not already providing telecommunications services; Rule R14–2–1106 sets forth grounds for denying CC&Ns and sets conditions to the CC&Ns that are issued. We believe these rules are not related to a plenary power of the Commission. Thus, these rules are not exempt from legislative oversight, such as attorney general review for matters of form, clarity, and compliance with authorizing legislation. *See* A.R.S. § 41–1044(A).

¶ 33 In *Tonto Creek,* we invalidated a Commission action purportedly transferring a CC&N from one corporation to another, on the grounds that no statute authorized such an action. 177 Ariz. at 56, 864 P.2d at 1088. We held that a statute was necessary because "[i]ssuing certificates of convenience and necessity is far from a plenary power of the Commission. To the contrary, it is a legislative power delegated to the Commission subject to restrictions as the legislature deems appropriate." *Id.* (citing *Corporation Comm'n v. Pacific Greyhound Lines,* 54 Ariz. 159, 177, 94 P.2d 443, 450 (1939)).[7]

---

5. U S WEST argues that we should ignore the Commission's citation of *Corbin* in its answering brief because it did not cite that case during the proceedings leading to the rules' promulgation. However, although its order did not specifically do so, the Commission cited *Corbin* in determining that it need not undergo the attorney general approval process. *See* Editor's Note in the Arizona Administrative Code in the Appendix to this opinion.

6. We agree with the Commission, however, that Rule R14–2–1104(C), which provides for the Commission to review and determine the reasonableness of initial tariffs, does reasonably relate to ratemaking. Likewise, Rule R14–2–1104(D) provides for the Commission to review rates and terms or conditions of service.

7. In *Tonto Creek,* the Commission ordered the unilateral transfer of a CC&N from one entity to another. 177 Ariz. at 55, 864 P.2d at 1087. We held that the Commission did not have jurisdiction to issue such an order without first complying with A.R.S. section 40–252, which states that "[t]he commission may at any time, upon notice to the corporation affected and after opportunity to be heard as upon a complaint, rescind, alter or

Similarly, the competitive rules not reasonably related to ratemaking are not within the Commission's plenary power, and are therefore subject to legislative constraints such as attorney general review.

¶ 34 The Commission argues that *Corbin* exempts these rules from attorney general review, contending that issuing such CC&Ns simply sets a classification for competitive services, which it argues is a reasonably necessary step in ratemaking. *See Consolidated Water Utils., Ltd. v. Arizona Corp. Comm'n,* 178 Ariz. 478, 483–84, 875 P.2d 137, 142–43 (App.1993). We reject this argument.

¶ 35 The issuance of a CC&N may be incidentally related to ratemaking. This incidental relationship, however, is not enough to exempt the rules from attorney general review. If it were, then the Commission would have the plenary power to issue CC&Ns, a proposition we rejected in *Tonto Creek.* While we agree that the Commission has the exclusive power to determine classifications, such as competitive services, the Commission does not have plenary power to issue a CC&N to a company to engage in that service. Granting CC&Ns is a power the legislature has granted to the Commission. As such, rules related to the issuance of CC&Ns are subject to legislative control, and hence are subject to review by the attorney general under A.R.S. section 41–1044.

■ ¶ 36 We also conclude that other rules do not relate at all to ratemaking or classification. Rule R14–2–1111 requires local exchange carriers to provide equal access for customers to choose long distance services. Rule R14–2–1112 requires local exchange carriers to "provide appropriate interconnection arrangements with other telecommunications companies." Rule R14–2–1114 requires companies to "provide quality service in accordance with this rule and with any other service quality requirements established by the Commission." Rule R14–2–1115 (A)–(C), (G)–(I) establishes adminis-

trative requirements. These are not reasonably related to the ratemaking function. We also disagree with the Commission's argument that the provisions of Rule R14–2–1114 relating to billing and collection from customers implicate ratemaking. Billing and payment terms apply after the rates have already been established.

¶ 37 In summary, while some of the competitive rules do reasonably relate to the Commission's plenary constitutional powers, others do not. These latter rules are instead provisions as to which the legislature granted the Commission power to act. The Commission may not insulate from review rules that are otherwise subject to attorney general review merely by enacting them with rules relating to its plenary powers. The Commission erred in bypassing the attorney general's review as to some of these rules. As a result, those rules are invalid.[8] *See* A.R.S. § 41–1030(A).

■ ¶ 38 The Commission argues that A.R.S. section 41–1044 is unconstitutional because it allows the attorney general to determine whether the Commission has the legal authority to promulgate its rules. According to the Commission, placing this power in the hands of an official of the executive department usurps the power of the judiciary, and thus violates separation of powers. *See* Ariz. Const. art. 3. This argument is meritless. The statute only gives the attorney general the power to make a determination whether the rules are within the Commission's power to enact and whether the rules are in proper form, are clear, concise, understandable, and comply with appropriate procedures. Nothing in the statute purports to usurp the judiciary's role in interpreting the laws and constitution of this State. Judicial review of the attorney general's decision is available. *See Woods,* 171 Ariz. at 299, 830 P.2d at 820 (ordering attorney general to certify Commission rules).

amend any order or decision made by it." *See id.* at 56, 864 P.2d at 1088.

8. To recap, the following rules were subject to attorney general review, and because they were not reviewed, they are invalid until such review

takes place: Rules R14–2–1103 through –1106, except Rule R14–2–1104(C) and R14–2–1104(D) as previously discussed in footnote 6; Rule R14–2–1111; R14–2–1112; R14–2–1114; and R14–2–1115 (A)–(C), (G)–(I).

## V.

¶ 39 U S WEST's claims are ripe for review. We hold, however, that it has failed to state a claim for breach of contract. On the other hand, the Commission improperly bypassed the statutory requirement that the attorney general review and approve those rules not reasonably related to service classification and ratemaking. These conclusions make it unnecessary to address whether U S WEST is improperly seeking injunctive relief or whether U S West's position on the contract issue is preempted by federal law. We do not find U S WEST's pursuit of this action unjustified, groundless, or harassing, and therefore reject TCG Phoenix's request for attorney's fees under A.R.S. sections 12–341.01(C) and 12–349.

¶ 40 The trial court's judgment that U S WEST has no cause of action for breach of contract is affirmed. The ruling that the competitive rules were not subject, in part, to review and approval by the attorney general is reversed. This matter is remanded to the trial court with directions to order the Commission to submit the invalidly promulgated rules to the attorney general for review under A.R.S. section 41–1044.

CONCURRING: WILLIAM F. GARBARINO, Judge, and REBECCA WHITE BERCH, Judge.